**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 22 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

WILLIAM J. QUIGLEY; DOROTHY
QUIGLEY,

     Plaintiffs-Appellees,

v.

SAUL F. ROSENTHAL; ANTI-
DEFAMATION LEAGUE,

     Defendants-Appellants.

_____

AMERICAN JEWISH COMMITTEE;
AMERICAN JEWISH CONGRESS;
AMERICANS UNITED FOR
SEPARATION OF CHURCH AND
STATE; ASIAN LAW CAUCUS;
HUMAN RIGHTS CAMPAIGN;
JEWISH COUNCIL FOR PUBLIC
AFFAIRS; LAMBDA LEGAL
DEFENSE AND EDUCATION FUND;
NATIONAL ASIAN PACIFIC LEGAL
CONSORTIUM; NATIONAL
PARTNERSHIP FOR WOMEN AND
FAMILIES; NOW LEGAL DEFENSE
AND EDUCATION FUND; PEOPLE
FOR THE AMERICAN WAY
FOUNDATION; VIOLENCE POLICY
CENTER; JOHN T. BAKER; MACON
COWLES; BRUCE S. GARBER;
THOMAS E. GOODREID; JEFFREY
JOSEPH; J.D. MACFARLANE; JAMES
H. MOSS; EDWARD T. RAMEY;

No. 01-1228

DAVID K. REES; BENJAMIN J.
SACHS; COLORADO LAWYERS
COMMITTEE,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 94-N-2782)**

---

Thomas B. Kelley, Faegre & Benson LLP, Denver, Colorado (Steven D. Zansberg, Faegre & Benson LLP, Denver, Colorado; Joseph C. Jaudon, and David H. Yun, Jaudon & Avery, LLP, Denver, Colorado, with him on the brief), for the defendants-appellants.

Lawrence W. Treece, Sherman & Howard, LLC, Denver, Colorado (Charlotte Wiessner, Sherman & Howard, LLC, Denver, Colorado; Jay S. Horowitz, Philip L. Gordon, Robert T. Fishman, Horowitz & Wake, Denver, Colorado; and Robert F. Nagel, Boulder, Colorado, with him on the brief), for the plaintiffs-appellees.

David K. Rees, Rees & Associates, P.C., Denver, Colorado, on the brief for John T. Baker, Macon Cowles, Bruce S. Garber, Thomas E. Goodreid, Jeffrey Joseph, J.D. MacFarlane, James H. Moss, Edward T. Ramey, David K. Rees, and Benjamin J. Sachs, amici curiae.

Erwin Chemerinsky, University of Southern California Law School, Los Angeles, California, and Catherine Fisk, Loyola Law School, Los Angeles, California, on the brief for American Jewish Committee, American Jewish Congress, Americans United for Separation of Church and State, Asian Law Caucus, Human Rights Campaign, Jewish Council for Public Affairs, Lambda Legal Defense and Education Fund, National Asian Pacific Legal Consortium, National Partnership for Women and Families; NOW Legal Defense and Education Fund, People for the American Way Foundation, and Violence Policy Center, amici curiae.

Steven M. Kaufmann and Brian Neil Hoffman, Morrison & Foerster, LLP, Denver, Colorado, on the brief for the Colorado Lawyers Committee, amicus curiae.

---

Before **BRISCOE**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Defendants Saul Rosenthal and the Anti-Defamation League appeal the district court's entry of judgment, following a jury trial, on plaintiffs' claims against them under the federal wiretap act[1] for using intercepted cordless telephone conversations, and under Colorado state law for defamation, invasion of privacy by intrusion, and false light invasion of privacy. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, reverse the judgment on plaintiffs' invasion of privacy by intrusion and false light invasion of privacy claims, and affirm the remainder of the judgment. Our partial reversal has no effect upon the damage awards.

## I. BACKGROUND

Plaintiffs William and Dorothy "Dee" Quigley are residents of Evergreen, Colorado, an upscale suburb in the foothills west of Denver. In August 1994, Mitchell and Candice Aronson moved into a house near the Quigleys. The initial interactions between the Quigleys and the Aronsons were positive. For example, the Quigleys hosted a "welcome party" so the Aronsons could become acquainted with the residents of the

---

[1] The federal wiretap act is formally known as the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986 and the Communications Assistance for Law Enforcement Act of 1994, 18 U.S.C. §§ 2510-22. For purposes of brevity, we refer to it simply as "the federal wiretap act."

neighborhood. Within a month, however, the relationship between the Quigleys and the Aronsons in general, and the relationship between Mrs. Quigley and Mrs. Aronson in particular, soured.

In mid-August 1994, Mrs. Aronson, unbeknownst to Mr. and Mrs. Quigley, took two of the Quigleys' children (ages 14 and 9 at the time) to an R-rated movie. Mrs. Quigley expressed her concern about the incident to Mrs. Aronson. In late September 1994, two of the Quigleys' children were standing outside their home when one of the Aronsons' vehicles, driven by a teenage neighbor and occupied by two of the Aronsons' children, swerved at the Quigley children. Mrs. Quigley again contacted Mrs. Aronson to express her concern. According to Mrs. Quigley, Mrs. Aronson confirmed that the sixteen-year-old neighbor had driven her children to school, but told Mrs. Quigley it was "none of [her] goddamn business." App. at 2117.

Many of the other precipitating events concerned the couples' dogs. In late August 1994, Mr. and Mrs. Quigley were outside their house planting bushes when their dog was attacked by the Aronsons' dog, "Bear." After the Quigleys separated the dogs, Mrs. Quigley called Mrs. Aronson to determine if Bear had been vaccinated. Mrs. Aronson allegedly told Mrs. Quigley that it was "none of [her] goddamn business," id. at 2104, refused to give her any information about Bear, and "let out a slew of obscenities," id. at 2105. In addition, Mrs. Aronson allegedly told Mrs. Quigley that the Quigley children were no longer welcome at the Aronsons' house, that they should stay at their end of the

4

street, and that she (Mrs. Aronson) was tired of giving them sodas. In response, Mrs. Quigley allegedly told Mrs. Aronson that she had no respect for her. Mrs. Aronson allegedly replied, "fuck you." Id. at 2107.

According to the Quigleys, Bear continued to run loose in the neighborhood. In late September or early October 1994, Mrs. Quigley was in her driveway preparing to take her children somewhere when Bear appeared and began acting aggressively toward her ("hunkered down" in a "crouch" and "growling"). Id. at 2120. Immediately after the incident, Mrs. Quigley drove to the Aronsons' house, told Mr. Aronson what had occurred, and informed him that she would contact the local animal control officer if there was another incident. According to Mrs. Quigley, Mr. Aronson said nothing and closed the door in her face.

Mrs. Quigley contacted the animal control office on two occasions in October 1994. On October 4, 1994, Officer James Riddle issued a warning notice to the Aronsons. According to Riddle, Mr. Aronson was "very relaxed about the situation and cordial," but Mrs. Aronson "was very upset, screaming and yelling." Id. at 4652. In particular, Mrs. Aronson stated "that she was going to 'get that bitch,'" id., and wanted to issue a warning against the Quigleys. On October 12, 1994, Mrs. Quigley again contacted animal control regarding Bear. After Mrs. Quigley signed a "promise to appear and prosecute," id. at 4659, Officer Riddle issued a summons to the Aronsons.

According to Mrs. Quigley, Mrs. Aronson began acting more aggressively toward

5

her following the second call to animal control. On several occasions when Mrs. Quigley walked her dog past the Aronsons' house, Mrs. Aronson allegedly stepped outside and yelled at Bear to "'go up there and get those pieces of shit [referring to Mrs. Quigley and her dog].'" Id. at 2136. On October 18, 1994, Mrs. Quigley was walking her dog in the neighborhood when Mr. and Mrs. Aronson allegedly approached in their vehicle and came to a "screeching halt behind [her]." Id. at 2138. Mrs. Aronson allegedly rolled down the passenger-side window of the vehicle and started screaming at Mrs. Quigley, calling her a "fat bitch" and telling her to "'get off the road, you piece of shit.'" Id. Mrs. Aronson allegedly continued yelling obscenities at Mrs. Quigley as the Aronsons pulled into their driveway. After getting out of their vehicle, Mrs. Aronson allegedly told Bear to "[g]o get the piece of shit [referring to Mrs. Quigley]," and said to Mrs. Quigley "[y]ou better watch your ass." Id.

Several critical events occurred on October 20, 1994. On that morning, Mr. Quigley was taking his son to school. As he started to drive down the street, Mr. Quigley observed one of the Aronsons' vehicles stopped in the middle of the street faced in his direction. Mr. Quigley drove his vehicle between the Aronsons' vehicle and a garbage dumpster that was by the edge of the street, apparently coming close to the Aronsons' vehicle. As Mr. Quigley passed the Aronsons' vehicle, he observed Mrs. Aronson inside the vehicle and concluded she was glaring at him. Id. at 1681-82.

At some point later that morning, Mr. and Mrs. Aronson, using a police scanner

6

inside their home, overheard part of a conversation over a cordless telephone between Mrs. Quigley and a friend named Katie Ughetta in New York state. During the lengthy (approximately two-hour) conversation, Mrs. Quigley and Ms. Ughetta apparently discussed the growing dispute between the Quigleys and the Aronsons. The Aronsons recorded the conversation. At the end of the conversation, Mrs. Quigley and Ms. Ughetta bantered about the Aronsons:

> Ughetta: And keep up the good work to isolate the Aronsons. I'll be praying for you. They're outside (unintelligible).
> Quigley: Well, if something big happens, you know, like there's a house burning or something, I'll call you.
> Ughetta: Absolutely. Well, you can do that for – is it the 30th? Is that that Guy Hawkes Day? Guy Fox? Guy Fox Day?
> Quigley: Guy Fuck Day?
> * * *
> Ughetta: Guy Fox? It's the English one where they burn the scarecrow in effigy. I believe it's Guy Fox. I can't remember (unintelligible).
> Quigley: Well, I love the name, but I don't know what it means.
> Ughetta: Yeah, I think they – I think something happened in British history where this guy was, like, you know, really bad news, like a serial killer like . . . .
> Quigley: Jack the Ripper.
> Ughetta: A Jack the Ripper kind of thing.
> Quigley: Yeah.
> Ughetta: I think that's what he was, and so every – every year, I think it's the day before Halloween, instead of celebrating Halloween, they celebrate Guy Fox Day and they burn . . .
> Quigley: Oh.
> Ughetta: . . . these scarecrow dummies in effigy of him.
> Quigley: Oh.
> Ughetta: So find out. Find out. That would be a good thing to do. Say, "Well, we figured that your roof was the best place to put this. So that the whole neighborhood could see it. I'm sorry that it burned down."
> * * *

7

Quigley: (unintelligible) and we wanted, you know, we wanted everybody to see it.  So we put it on the roof.  Now, if I can't get a scarecrow, do you think I could douse a cross?

Ughetta: One of the kids.  I think one of the kids would be fine.  Yeah, a cross would be cool.

Quigley: A big cross and set that aflame?

Ughetta: Put a couple of hoods on top of it.

Quigley: Yeah, it's Halloween.  We could just explain to the police, "You know, we're all dressed up.  It's with our costume."

Ughetta: That's right.  It'll have to be realistic to prove to people that we were pretending we were Klu Klux Klan members.

Quigley: Anti-Semitic?  I don't think so, officer.

Ughetta: Right.  That's like the Holocaust.  Tape a big oven door on the side of their house.

Quigley: As if their front door is really an oven door.  (unintelligible)
* * *

Ughetta: Throw a few ashes around the outside there.

Quigley: Yeah.  We could throw some bars of soap and a lamp shade around the front, you know.

Ughetta: Oh, that is so (unintelligible)

Quigley: Sick, sick, sick.  Oh, gosh.

Ughetta: Alright (unintelligible)

Quigley: Alright.

App. at 5601-05.

Later on the morning of October 20, 1994, the Aronsons overheard and recorded a cordless telephone conversation between Mrs. Quigley and Mr. Quigley, who was calling from his place of work.  During the conversation, Mr. Quigley informed Mrs. Quigley of his encounter earlier that morning.  Mr. Quigley stated that he drove between Mrs. Aronson's vehicle and a garbage can on the side of the street at "about 25 miles an hour" and that "[i]t was very, very tight."  Id. at 5606.  Mr. Quigley also stated that he "thought about stopping," "pulling open the door [to Mrs. Aronson's vehicle] and throwing her on

8

the ground." Id. at 5608. Mrs. Quigley responded: "Well, see, that's what they're trying to get us to do. So, you know, as long as there's a way around it, I don't care if you have to drive across the top of their property." Id. The Quigleys agreed "to just ignore them [the Aronsons]," and to have "[a]bsolutely no contact with them whatsoever." Id. The Quigleys continued, however, to discuss the situation:

> Mrs. Quigley: Well, I know that we're getting to them. The fact that this is the way they're behaving. She can't stand it.
> Mr. Quigley: Yeah.
> Mrs. Quigley: And I would much rather be in our shoes, you know, than her shoes. I mean, she's just spinning her wheels, and I'm telling you, eventually they will do something. They will blow this all out of the water, and they'll be totally wrong. They'll do something, and we'll come down on them like a ton a bricks.
> Mr. Quigley: Um-hum.
> Mrs. Quigley: And there's already history with the County Sheriff.
> Mr. Quigley: Right.
> Mrs. Quigley: The Animal Control, and these were all separate.
> Mr. Quigley: Yeah.
> * * *
> Mrs. Quigley: And when you make an Animal Control complaint it goes to the County Sheriff. So that property is going to keep popping up with their name on it and, you know, they're not going to fool anybody.
> Mr. Quigley: Yeah.
> Mrs. Quigley: And they don't have a clue as to how law enforcement works here.
> Mr. Quigley: Well, they also think -- they don't realize that people have -- [such a] strong distaste for them right away, you know, because they're New Yorkians.
> Mrs. Quigley: Yeah.
> Mr. Quigley: So they don't realize people immediately are going to assume that they're the asshole.
> Mrs. Quigley: Oh, yeah, and with the history, you know, it's already on track. That's all you need. . . .
> * * *
> Mrs. Quigley: You know, but this will be fine and, you know, we

9

give them enough rope to hang themselves and they'll do it.

   Mr. Quigley: Yeah. I just don't want to spend my life obsessing over them.

   Mrs. Quigley: No, we won't.

   Mr. Quigley: You know?

   Mrs. Quigley: We won't, but I'm not going to let them get away with this kind of shit. When you consider everything that's happened, the way they've behaved through it.

   Mr. Quigley: Well, and the way it affects the kids. The way our kids won't play in the street, they won't go out.

   Mrs. Quigley: I – yeah. The language is so bad we can't let our kids out. Well, then, you know, you've got to stop it somehow, and if it means, you know, clipping their wings and going after them in other ways, then I don't have a problem with that, and they're wrong. When that damned dog is out, you know, I can't go out. Nobody can go out.

   Mr. Quigley: Yeah.

Id. at 5615-21.

On the evening of October 20, 1994, Mrs. Aronson contacted the Jefferson County Sheriff's Department and reported that she had been sitting in her vehicle on the side of the street earlier that morning when Mr. Quigley drove directly at her at a high rate of speed, but swerved to avoid her at the last minute. A sheriff's deputy was dispatched to the neighborhood to investigate. After speaking with the Aronsons and the Quigleys, the deputy concluded no traffic violation could be substantiated.

On October 21, 1994, Mr. Aronson contacted the Denver office of the Anti-Defamation League (ADL) and reported that the Quigleys were engaging in threatening, anti-Semitic behavior. The ADL referred the Aronsons to Gary Lozow, a local attorney who specialized in criminal defense work, and who was a volunteer and board member for the ADL's Denver office and had been involved with the ADL in sponsoring

10

Colorado's ethnic intimidation statute.

Lozow and the Aronsons met on October 22, 1994. Lozow's initial response was to determine whether it was legal for the Aronsons to overhear and record the Quigleys' cordless telephone conversations. With the help of an associate attorney, Richard Kornfeld, Lozow concluded that the Aronsons' activities were legal under state and federal law. Lozow contacted assistant district attorney Mark Pautler, an acquaintance and neighbor, to get his views on whether the Aronsons' activities were legal.[2] Pautler, like Lozow, concluded the activities were legal. Lozow then contacted the Aronsons, advised them of his conclusions, and suggested that they contact the district attorney's office.

In late October, the Aronsons met with Pautler to discuss their allegations. The Aronsons allege that Pautler directed them to continue recording the Quigleys' cordless telephone conversations, but Pautler denies doing so. In any event, it is uncontroverted that the Aronsons continued recording the Quigleys' telephone conversations and, on a regular basis, delivered copies of those recordings to Pautler. In early November, Bobbie Towbin, the associate director of the ADL's Denver office, contacted district attorney Dave Thomas to check on the status of any possible criminal proceedings against the Quigleys.

---

[2] There is also evidence that Lozow contacted district attorney Dave Thomas for the same purpose.

11

Between October 20 and November 1, 1994, the Aronsons recorded approximately eight conversations in which Mrs. Quigley referred to the Aronsons' Jewish faith. They also recorded various conversations of Mrs. Quigley with friends, family, and neighbors in which she mentioned taking some type of physical action toward the Aronsons or their home. Finally, the Aronsons recorded one conversation between Mr. and Mrs. Quigley in which Mr. Quigley referred to an "old boys' network" in the film industry in which he worked, and complained about a colleague getting ahead because he was Jewish. App. at 5746.

In early November, Lozow contacted Stuart Kritzer, a personal injury attorney who also volunteered with the ADL and sat on the local ADL board of directors. Lozow and Kritzer met with the Aronsons on or about November 5, 1994. Also present were Kornfeld (Lozow's associate) and Cindy Silverman, an employee of the ADL. At that meeting, the attendees discussed options available to the Aronsons for stopping the alleged anti-Semitic harassment by the Quigleys, including mediation, criminal charges against the Quigleys, a civil suit against the Quigleys, and publicizing the matter via a press conference or other means. The attendees also agreed that the Aronsons should continue recording the Quigleys' telephone conversations.

A subsequent meeting was held on November 8, 1994. Present at that meeting were the Aronsons, Lozow, Kritzer, Kornfeld, and Towbin. The attendees again discussed their course of action. During the meeting, Towbin indicated that the ADL had

12

several objectives, including "public exposure" of the Quigleys. Id. at 3566. Following the meeting, Kritzer and one of his associates (Andy Silverman, the husband of ADL employee Cindy Silverman) began listening to the recordings and drafting a civil complaint to be filed against the Quigleys.[3] At no time, however, did Kritzer or his associate, Lozow or his associate, or the ADL investigate the background of the Aronsons or the Quigleys, or speak with neighbors or other third-parties who might have information regarding the situation.

On December 1, 1994, Lozow and Kritzer entered into a contingent fee agreement with the Aronsons. On December 6, 1994, Lozow and Kritzer filed a civil complaint in federal court on behalf of the Aronsons. The complaint alleged that, "[s]hortly after the [Aronsons] moved into their home . . . , they became the objects of religious, class-based invidiously discriminatory animus and conduct by the [Quigleys], who conspired with each other and others." Id. at 5162. To support this allegation, the complaint quoted or referred to various snippets from the Quigleys' recorded telephone conversations occurring between October 20 and November 1, 1994. The snippets included the Holocaust-related comments made by Mrs. Quigley during her October 20, 1994, conversation with Ms. Ughetta, comments made by Mr. and Mrs. Quigley during their

_____

[3] Although the Aronsons continued to record the Quigleys' conversations, there was little contact between the couples during November and early December 1994. Indeed, the only incident involving the two couples occurred in mid-November, when the Aronsons called animal control to report that the Quigleys' dog was running loose on the Aronsons' property.

13

conversation of the same date discussing the vehicular incident with Mrs. Aronson, and other comments made by Mrs. Quigley during various telephone conversations. Id. at 5164-65 (e.g., telling a neighbor that the Aronsons had been stealing rocks from a builder's house across the street, telling a neighbor that "we're harassing" Mrs. Aronson, referring to Mr. Aronson as a "stinking piece of crap"). The complaint further alleged that, on October 20, 1994, Mr. Quigley "intentionally vehicularly assaulted Candice Aronson while she was parked across from her home by means of approaching her at high speed to within inches of her car, with the expressed intention of terrifying the Plaintiff and putting her in fear for her life and safety." Id. at 5163. Based upon these allegations, the complaint asserted claims for conspiracy to interfere with civil and property rights in violation of 42 U.S.C. §§ 1982 and 1985, ethnic intimidation in violation of Colo. Rev. Stat. § 13-21-106.5 and § 18-9-121, defamation-slander per se, assault, civil conspiracy, and outrageous conduct.

Later that same day, defendant Rosenthal, the director of the ADL's Denver office, prepared to hold a press conference concerning the Aronson/Quigley matter. In particular, Rosenthal drafted an "opening statement" that he intended to read at the outset of the press conference. Id. at 2775. In doing so, he allegedly relied on a copy of the civil complaint filed against the Quigleys. It is uncontroverted, however, that he never listened to the recorded phone conversations, read the transcriptions of those conversations, or spoke to the Aronsons, the Quigleys, or any other persons who might

14

have direct knowledge of the dispute. Rosenthal asked Towbin and Kritzer to review the draft. At the suggestion of Kritzer, Rosenthal agreed to omit a concluding paragraph concerning the potential filing of criminal charges against the Quigleys.

On December 7, 1994, Rosenthal, accompanied by the Aronsons and Kritzer, held a press conference at the ADL's Denver office. Rosenthal read his opening statement, which included the following remarks:

*Almost immediately upon [the Aronsons'] arrival they became the targets of a vicious anti-Semitic campaign by their neighbors, William and Dorothy, known as Dee, Quigley. The purpose of this campaign – which Mrs. Quigley referred to as "Operation Aronson" -- was to drive the Aronsons from their new home and neighborhood.

*This has been one of the most astonishing cases of anti-Semitic harassment our office has ever confronted. The consistency and frequency of threats, sustained over months, makes this a very different kind of anti-Semitic incident. Unlike the more typical case of an isolated verbal or physical assault, what we have here are dozens of instances of attempts to intimidate, threaten and do harm to the Aronsons and to conspire with others in the neighborhood to do the same.

*The Quigleys engaged in all of the following activities among others. They threatened to burn a cross on the Aronson's property. Planned to tape a facsimile of an oven door on their home. Discussed plans to douse one of the Aronson children with a flammable liquid and to burn a scarecrow on their property. They have conspired with each other and others in the neighborhood to involve the homeowners association in driving the Aronsons out. They defamed and slandered the Aronsons to their neighbors by attributing false behavior to them. And, ultimately, they threatened to commit bodily harm against the Aronson family using the term "blow him away" and asking neighbors to help in acquiring hand grenades and dynamite.

*On one occasion William Quigley sought to frighten Candice by driving his car at her at high speed while she was parked in her own vehicle.

15

Swerving away at the last second to avoid a collision, Mr. Quigley and his wife later retold the story and bragged about his effort to their friends.

*William and Dee Quigley have proven themselves to be dangerous neighbors.

*We believe that the behavior in which the Quigleys have engaged is not only anti-Semitic, it is anti-Christian, anti-Democratic and anti-American. It is not the kind of behavior those of us who live in Colorado can or will tolerate. The filing of the lawsuit makes clear that this kind of activity will not go unchallenged or unpunished.

Id. at 5178-80. Rosenthal's comments at the press conference, including many of the above-described statements, were extensively quoted in the local media.

Later that same day, Rosenthal appeared on a radio program called the Greg Dobbs Show to discuss the Aronson/Quigley matter. During the show, Rosenthal made the following comments:

*This is a, this is a pretty astounding case of anti-semitism, and it reminds us that even when we get a little complacent and think that things are calming down out there, there are some pretty nasty people hanging around looking to do harm.

*[W]hat makes this case particularly unique is the volume of the anti-semitic activity.

*[I]n October, the Aronsons became aware that the Quigleys were engaged in, in what I am describing as a campaign of anti-semitism to try to drive the Aronsons out of the community. They were involved in trying to bring other neighbors into this process, conspiring and discussing with them possible violent acts. In the lawsuit we talk about them being engaged in a civil conspiracy with the neighbors.

*[T]here was an attempted assault, vehicular assault.

*They had plans to . . . burn a cross on the Aronsons' lawn.

16

*There had even been a discussion in one of the conversations about dousing one of the Aronson children with a flammable liquid, and I think that the most frightening part of this is that they have discussed with their neighbors how to acquire weapons, . . . specifically hand grenades and dynamite, that could be used to, . . .presumably to blow up the home or their vehicle or in some other way to . . . attack their, their . . . domicile.

*We have the evidence to support and sustain these charges, . . . that evidence we believe in a court of law will stand up very comfortably against any form of scrutiny.

*When asked whether there were any friends of the Quigleys who were "disgusted" by the Quigley's activities, Rosenthal responded: "I think . . . we are touching on an area here that the attorneys have advised us would be best not discussed publicly."

*Mr. Quigley repeatedly has expressed his animus towards individuals of the Jewish faith, and he even talks about describing his lack of satisfactory career progress as attributable to the superior success of his Jewish colleagues, and he attributes their success to being part of a . . . boys network of Jews.

*[I]t was only with the accumulative evidence over a period of time that, that clearly convinced them, and certainly us, that this is an anti-semitic harassment, this is not just a neighborly dispute or misunderstanding.

*[T]hat's what makes it the worst [case of anti-Semitic behavior] that I've seen in so many years, since the [Alan] Berg murder, because it's . . . so massive in the number of acts that . . . the Quigleys engaged in against the Aronsons.

*[T]he Aronsons have been concerned about the safety of their kids, and, you know, have not permitted the kids the kind of freedom to go about doing what, what teenagers would normally want to be doing at this point in their life, because they're just concerned about the extent to which the [Quigleys] might do them . . . bodily harm.

*[I]t's not a two-sided story.  It's hard for me . . . to convey that without your actually being able to know about the nature of the evidence.  But, . . . the allegations that are in the lawsuit are based on words which Mr. and

Mrs. Quigley have spoken. Not that we think they've spoken, or that they might have spoken, but that they, in fact, have spoken. Uh, so, it isn't a question of, you know, if you ask the Quigleys they would say that the Aronsons are terrible people and have engaged in a campaign to [throw] them out of the neighborhood, that's nonsense, it's not, it's not even plausible. The Aronsons haven't [done] anything, they simply moved into the house, and within weeks thereafter the Quigleys started this effort to get them thrown out of the neighborhood because they didn't want, as they referred to them, I can't even use the term because it's the 'f' word, those 'f' Jews in their community. And, uhm, that strikes me as, as one of those . . . questions that doesn't have two sides to it.

*[W]hat I'm telling you is that the evidence is compelling, it's . . . non-controvertible, and it's overwhelming.

Id. at 5181-99.

Two days later, on December 9, 1994, the district attorney filed criminal charges against the Quigleys. In particular, Mr. Quigley was charged with felony menacing (i.e., using his vehicle to place Mrs. Aronson in fear of imminent serious bodily injury). Both Mr. and Mrs. Quigley were charged with ethnic intimidation and conspiracy to commit ethnic intimidation.

The ramifications of the lawsuit, the press conference, and the criminal charges were immediate and severe. Within days of the lawsuit being filed and the press conference, the Quigleys began receiving various types of hate mail, including two suspicious-looking packages that had to be opened by law enforcement authorities, as well as a box containing dog feces. The Quigleys also received mail from "militant wackos" who applauded what the Quigleys had allegedly done to the Aronsons. Id. at 1841. Letters were sent to Mr. Quigley's employer, United Artists, threatening to boycott

18

UA's theaters nationwide if UA failed to terminate Mr. Quigley. In mid-December 1994, the Quigleys attended their local church and were publicly denounced by their priest. For several months, the Quigleys shopped for groceries and necessities in other towns, and frequently used other names for fear of being recognized. Between December 1994 and February 1995, the Quigleys hired security officers to guard their home and to accompany Mrs. Quigley while shopping.

At some point in December 1994, Lozow and Kritzer learned that the federal wiretap act had been amended by Congress, effective October 25, 1994, to make it unlawful to intercept the radio portion of a cordless telephone call. Pub. L. No. 103-414, § 202(a)(1), 108 Stat. 4290, 4291 (codified as amended at 18 U.S.C. § 2510(1) (deleting a provision that excluded the radio portion of cordless telephone communication transmitted between handset and base unit from definitions of "wire communication" and "electronic communication")) (current version at 18 U.S.C. §§ 2510, 2511 (1994)). Accordingly, they prepared and filed an amended civil complaint on behalf of the Aronsons that eliminated any references to taped conversations after October 25, 1994.

In January 1995, the Quigleys responded to the Aronsons' complaint, denying that they conspired to intimidate the Aronsons or violate the Aronsons' civil rights. The Quigleys also asserted counterclaims against the Aronsons, Rosenthal, and the ADL. In addition, the Quigleys filed a separate federal lawsuit asserting, in pertinent part, that Rosenthal and the ADL, through the actions of Lozow and Kritzer, violated the federal

19

wiretap act by intercepting and using the Quigleys' cordless telephone conversations. The lawsuit was consolidated with the lawsuit originally filed by the Aronsons.

On January 6, 1995, defendant Rosenthal directed a memo to Towbin, the associate director of ADL's Denver office, stating that he "want[ed] to be sure [they] [we]re maximizing all opportunities . . . available from the Aronson case." Id. at 2864. The memo directed Towbin to alert the Intermountain Jewish News about the Quigley/Aronson matter, and to keep the ADL's New York and Los Angeles offices up-to-date on the matter. Lastly, the memo directed Towbin to "[m]ake hay while the sun shines," but to do so "graciously." Id. at 2885-86.

The criminal charges filed against the Quigleys were assigned to assistant district attorney Steven Jensen for prosecution. After initially reviewing the case file, Jensen concluded that the sheriff's report was "pretty sparse" considering the serious nature of the charges. Jensen further learned that the sheriff's department had not interviewed any third-party witnesses. Jensen conducted his own investigation into the matter, including listening to many of the recorded phone conversations. After doing so, Jensen concluded that the telephone conversation between Mrs. Quigley and her friend on the morning of October 20, 1994, during which the two women briefly discussed Holocaust-related matters, was simply "venting" and "sick humor." Id. at 4237. Jensen further concluded that Mr. Quigley had made no bigoted or racist comments during any of the recorded conversations. On January 20, 1995, Jensen dismissed all charges against the Quigleys

20

except for one charge against Mr. Quigley arising out of the October 20, 1994, incident where he had driven past Mrs. Aronson's vehicle.

The Quigleys filed suit against the district attorney. Those claims were settled in the fall of 1995 and, as part of the settlement, the district attorney published two letters of apology. In those letters, the district attorney stated he was not aware of any evidence proving that the Quigleys "violated Colorado's laws against ethnic intimidation," id. at 1869, or were "guilty of anti-Semitic conduct or harassment." Id. at 1871.

The Aronsons filed a lawsuit against Lozow and Kritzer in Colorado state court alleging, in part, that the attorneys failed to act solely for the Aronsons' benefit, but instead acted for their own benefit and/or the benefit of the ADL. The lawsuit further alleged that the attorneys failed to fully inform the Aronsons about their relationship with the ADL and that the relationship might pose a conflict of interest.

On February 20, 1998, Lozow, Kritzer, the Aronsons, and the Quigleys reached a settlement whereby Lozow and Kritzer paid monies to the Quigleys and the Aronsons, and all parties to the settlement agreed to release each other from liability for all federal and state civil claims. However, the settlement did not include the Quigleys' claims against the ADL or Rosenthal. The ADL reimbursed Lozow and Kritzer for the full amounts of the deductibles on their respective malpractice insurance policies.

Six of the Quigleys' claims against Rosenthal and the ADL proceeded to jury trial in April 2000. The jury found in favor of the Quigleys on five claims: (1) defamation

21

against Rosenthal and the ADL based on statements made by Rosenthal during the December 7, 1994, press conference; (2) defamation against Rosenthal and the ADL based on statements made by Rosenthal during his December 7, 1994, appearance on the Greg Dobbs Show; (3) false light invasion of privacy against Rosenthal and the ADL based on statements made by Rosenthal during the same press conference and radio show; (4) invasion of privacy by intrusion against the ADL based on the interception and/or use of the Quigleys' private telephone calls by Towbin, Lozow, and/or Kritzer, acting as the ADL's agents or co-conspirators; and (5) violation of the federal wiretap act (18 U.S.C. § 2511(1)(d)) against the ADL based on the use of intercepted telephone calls by Lozow and/or Kritzer, acting as the ADL's agents or co-conspirators, in preparing and filing the Aronsons' lawsuit. The jury awarded Mr. Quigley damages in the following amounts: (1) $900,000 in economic damages; (2) $100,000 in non-economic damages; (3) state-law punitive damages of $500,000 against Rosenthal and $250,000 against the ADL; and (4) federal-law punitive damages of $5,000,000 against the ADL. The jury awarded Mrs. Quigley damages in the following amounts: (1) no economic damages; (2) $500,000 in non-economic damages; (3) state-law punitive damages of $500,000 against Rosenthal and $250,000 against the ADL; and (4) federal-law punitive damages of $2,500,000 against the ADL. The district court, pursuant to the defendants' post-trial motions, reduced the compensatory damage awards by $175,000 to "reflect the monies received by plaintiffs in their settlement with Lozow and Kritzer," and reduced Mrs. Quigley's

22

"award of state-law punitive damages . . . to an amount equal to her compensatory damages of $325,000." Id. at 1527.

## II.

### *Defamation*

*"Public concern"*

Defendants contend the district court erred in concluding that the statements upon which plaintiffs based their defamation claims did not involve matters of "public concern." The statements at issue are those made by Rosenthal on December 7, 1994, at the press conference and during his later appearance on the Greg Dobbs Show. We review the issue de novo, not only because it was decided by the district court in the context of defendants' motion for summary judgment, see Tax & Accounting Software Corp. v. United States, 301 F.3d 1254, 1257 (10th Cir. 2002) (discussing standard of review applicable to district court decisions granting or denying motions for summary judgment), but also because it involved a question of law, see Lewis v. McGraw-Hill Broadcasting Co., 832 P.2d 1118, 1121 (Colo. Ct. App. 1992) (concluding that, under Colorado law, "[w]hether the matter involved is of public concern is a question of law for the court"); see generally Salve Regina College v. Russell, 499 U.S. 225, 231 (1991) (discussing standard of review for questions of law).

State defamation laws are designed to "protect[] an individual's interest in his or her good name, providing a cause of action for damage to reputation caused by false

statements." Jefferson Sch. Dist. No. R-1 v. Moody's Investor's Serv., Inc., 175 F.3d 848, 852 (10th Cir. 1999). The First Amendment, however, serves competing interests, namely freedom of expression, and thus "limits the scope of state defamation laws." Id. For example, "the First Amendment prohibits public officials and public figures from recovering damages for false and defamatory statements unless they demonstrate that the statement was made with actual malice," i.e., that the statement was known by the declarant to be false or was made with reckless disregard for its truth. Id.

In Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the Court refused to impose a federal constitutional standard with respect to allegedly defamatory statements made about private individuals. Instead, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id. at 347.

Consistent with Gertz, the Colorado Supreme Court has extended the New York Times Co. v. Sullivan, 376 U.S. 254, 279 (1964) "actual malice" standard of liability to cases where "a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern."[4]

---

[4] Under Colorado law, if a private individual is involved and the matter is not one of "public or general concern," the plaintiff merely needs to establish fault amounting to negligence on the part of the defendant. See Williams v. District Court, 866 P.2d 908, 912 n.4 (Colo. 1993).

Walker v. Colorado Springs Sun, Inc., 538 P.2d 450, 457 (Colo. 1975); see also

Diversified Mgmt., Inc. v. The Denver Post, Inc., 653 P.2d 1103, 1106 (Colo. 1982)

(refining "actual malice" standard of liability by "adopting the same definition of

'reckless disregard' in cases involving public officials, public figures, and matter of

public or general concern").

Defendants do not dispute that the Quigleys were private individuals at the time

the alleged defamatory statements were made. Instead, defendants assert that the

statements involved matters of public or general concern since they concerned a civil

lawsuit alleging "that the Quigleys had conspired with others to deprive the Aronsons of

their constitutional rights on the basis of their religion and race." Defs' Op. Br. at 26.

The district court rejected defendants' arguments, concluding that defendants' statements

did not relate to a matter of public or general concern:

> [T]he bulk of the allegedly defamatory statements were based on excerpts
> of private telephone conversations between the Quigleys and other third
> parties which the Aronsons surreptitiously intercepted. In this regard, the
> Quigleys' position contrasts to that of the plaintiffs in Diversified
> Management, Inc., in which the court found that alleged widespread and
> ongoing land-development schemes of questionable propriety constituted a
> matter of public concern strictly because the matter still had the potential to
> affect future buyers of lots which were yet-unsold. Similarly, in Lewis, the
> court found a matter of public interest existed in part because the plaintiff
> filed a civil lawsuit to "protest[] racially motivated policies of a large retail
> establishment which allegedly had been directed against her." Thus, in
> Lewis, in addition to the fact that the plaintiff had essentially thrust herself
> into a public debate through her lawyer's public commentary at a local
> meeting, the court relied on the fact that resolution of the issues could have
> an [effect] on other patrons of a commercial entity.
>     At the time of the allegedly defamatory statements in this case,

25

Rosenthal had received merely one unsolicited request from the press based on the filing of the [civil] lawsuit, as compared to the "immediate and widespread publicity from the various media organizations" which the filing of the underlying lawsuit in Lewis prompted. It was defendants' decision (arguably along with the Aronsons'), not the Quigleys', to amplify the matter by calling a press conference under the ADL name. Because, at the time of the press conference on December 7, 1994 – the original publication of the allegedly defamatory statements – the dispute between the Aronsons and the Quigleys was still essentially private, I conclude that the Quigleys were not public figures subject at that point, and Rosenthal's statements about them are, accordingly, not subject to the higher [actual malice] standard [of fault].

App. at 236-37 (internal citations omitted).

Unfortunately, Colorado law provides no clear set of guidelines for determining whether a matter is of "public concern."[5] See Williams v. Continental Airlines, Inc., 943 P.2d 10, 17 (Colo. Ct. App. 1996) ("The boundaries of public concern cannot be readily defined, but must be determined on a case-by-case basis."). At best, the Colorado courts have indicated that "a matter is of public concern whenever 'it embraces an issue about which information is needed or is appropriate,' or when 'the public may reasonably be expected to have a legitimate interest in what is being published.'" Id. (quoting Lewis, 832 P.2d at 1121); see also Barrett v. Univ. of Colo. Health Sci. Ctr., 851 P.2d 258, 263 (Colo. Ct. App. 1993) (holding, in case involving public employee's constitutional right of free speech, that "[t]he determination of whether . . . speech touches a matter of public

---

[5] The difficulty in determining whether a matter is of "public concern" is precisely why the Supreme Court eschewed adopting such a federal constitutional standard in Gertz. See 418 U.S. at 346.

26

concern rests on a particularized examination of each statement to determine whether it can be fairly considered as relating to any matter of political, social, or other concern to the community"). Further, the Colorado courts have indicated that "the balance should be struck in favor of a private plaintiff if his or her reputation has been injured by a non-media defendant in a purely private context." Williams, 943 P.2d at 18.

Applying these general standards to the facts presented here, it is apparent that the statements were made by a non-media defendant (Rosenthal) and concerned private plaintiffs (the Quigleys), rather than public officials or public figures. To that extent, the balance would seem to tip in favor of concluding that the matter was of private, rather than public, concern. On the other hand, defendants point to two factors they suggest tip the balance in favor of concluding the matter was of public concern. First, defendants note that Rosenthal was discussing allegations made in a civil lawsuit filed against the Quigleys. Although it is not completely clear, it appears that defendants are suggesting that civil litigation is always a matter of public concern. Second, defendants note that the civil lawsuit, and in turn Rosenthal's statements, concerned allegations of religious and ethnic discrimination. According to defendants, any type of discrimination, including religious and ethnic discrimination, is necessarily a matter of public concern.

Addressing defendants' points in order, it is far from certain that all civil litigation is considered to be a matter of public concern under Colorado law. Perhaps the most analogous Colorado case is Lewis, where private plaintiffs sued media defendants for

27

falsely reporting during a newscast that one of the plaintiffs previously had been arrested for obstruction of justice, indecent exposure, and prostitution. The Colorado Court of Appeals concluded that the incorrect statements "involved a subject matter of . . . public concern." 832 P.2d at 1121. In reaching this conclusion, the court noted "that the newscast emerged in the context of a persistent and concededly public controversy over [a major retailer's] policies towards minorities, a controversy triggered by publicity surrounding plaintiffs' $15 million lawsuit and their allegations of racially discriminatory policies by [the retailer]." Id. Although the existence of a civil lawsuit was a relevant factor in Lewis, nothing in the court's opinion suggests that the mere filing of a civil lawsuit, by itself, is sufficient to trigger "public concern." Rather, it appears clear that the content of the lawsuit is the critical factor. See Lytle v. Wondrash, 182 F.3d 1083, 1088 (9th Cir. 1999) ("To determine whether Lytle's litigation involved a matter of public concern, we must determine the content, form, and context of her lawsuit."); Rice v. Ohio Dep't of Transp., 887 F.2d 716, 720-21 (6th Cir. 1989) (indicating that not every lawsuit is a matter of public concern), vacated on other grounds, 497 U.S. 1001 (1990); Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 420 (7th Cir. 1988) (same); cf. Time, Inc. v. Firestone, 424 U.S. 448, 457 (1976) ("The details of many, if not most, courtroom battles would add almost nothing toward advancing the uninhibited debate on public issues thought to provide principal support for the decision in New York Times."); but see Carol Rice Andrews, The First Amendment Problem with the Motive Restrictions in the Rules

28

of Professional Conduct, 24 J. Legal Prof. 13, 60 (2000) (suggesting that "all civil lawsuits involve matters of public concern").

That leads to defendants' remaining point, i.e., that the allegations in the Aronsons' lawsuit of religious and/or ethnic discrimination were sufficient to trigger public concern. The defendants appear to be on stronger ground here. In Connick v. Myers, 461 U.S. 138, 148 n.8 (1983), the Court stated that "racial discrimination," at least in the context of public-employment, is "a matter inherently of public concern." The Colorado courts generally have followed suit. E.g., Barrett, 851 P.2d at 264 ("Speech which touches on a matter of public concern includes that which . . . seeks to expose discriminatory practices."); Lewis, 832 P.2d at 1121 (concluding matter of public concern existed where civil lawsuit alleged that major retailer had adopted a policy and practice of discriminating against black customers); Gabel v. Jefferson Co. Sch. Dist. R-1, 824 P.2d 26, 30 (Colo. Ct. App. 1991) (concluding allegations of reverse discrimination by public employer were matters inherently of public concern).

Notwithstanding this case law, two factors unique to this case weigh against the conclusion that the allegations in the Aronsons' lawsuit were a matter of public concern. First, unlike the cases cited above, the allegations of discrimination asserted in the Aronsons' lawsuit were not asserted against a public employer, nor were they asserted against any entity or person with which the general public had contact (e.g., the major retailer in Lewis). Thus, there was no concern that the public's tax dollars were

supporting discrimination (e.g., as in the instance of a public employer charged with discrimination), nor was there a concern that members of the public were likely to be harmed or discriminated against (e.g., as in the instance of a major retailer charged with discrimination). See Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993) (concluding that employee's complaints of sex discrimination did not implicate matters of public concern because they did not implicate "system-wide discrimination" and instead "were motivated by and dealt with her individual employment situation"); cf. Williams, 943 P.2d at 18 (concluding public concern was not implicated where there was "no claim or evidence that plaintiff [wa]s an unsafe or less skilled pilot because he allegedly raped or attempted to rape women during off-duty hours," nor any evidence "that members of the flying public [we]re in danger of being sexually assaulted by plaintiff").

Second, and most importantly, Rosenthal and the ADL were intimately familiar with the Aronsons and their allegations, having talked and met with the Aronsons, as well as with Lozow and Kritzer, on numerous occasions between late October and early December 1994. Unlike a third-party (e.g., newspaper reporter) unfamiliar with the parties to a lawsuit or its underlying facts, Rosenthal and the ADL were in a position to know, and indeed knew or should have known, that the allegations in the Aronsons' lawsuit were baseless. Accordingly, we are unable to conclude that Rosenthal's comments at the press conference and on the radio show involved matters of "public concern" since Rosenthal and the ADL knew or should have known that the Aronsons'

30

allegations of racial discrimination/harassment were not colorable.[6]  See Kemp v. State

Bd. of Agric., 803 P.2d 498, 504 (Colo. 1990) ("When an employee alleges a colorable

claim that a university is guilty of racial discrimination, it is a matter of public concern.")

(emphasis added); see generally Hutchinson v. Proxmire, 443 U.S. 111, 135 (1979)

("those charged with defamation cannot, by their own conduct, create their own

defense"); Snead v. Redland Aggregates, Inc., 998 F.2d 1325, 1330 (5th Cir. 1993) ("A

speaker cannot turn his speech into a matter of public concern simply by issuing a press

release.").  We agree with the district court that the statements made by Rosenthal at the

press conference and during the radio show did not involve matters of public concern.[7]


*Fair report privilege*

Defendants assert the district court erred in refusing to give their tendered

instruction regarding the common law doctrine of fair report, which provides a privilege

to reports of in-court proceedings if they are fair and substantially correct.  See Tonnessen

v. Denver Publ'g Co., 5 P.3d 959, 964 (Colo. Ct. App. 2000).  We review for abuse of

---

[6]  We reject the dissent's suggestion that plaintiffs have conceded the subject of the lawsuit was a matter of public concern.  The point of the language from plaintiffs' answer brief which is quoted by the dissent is that defendants cannot "create [their] own 'constitutional' defense by the very defamations at issue."  Aplee. Br. at 32.  In any event, a complete reading of the answer brief demonstrates that plaintiffs vigorously dispute defendants' "public concern" arguments.

[7]  Our conclusion renders moot defendants' argument that the Quigleys failed to produce clear and convincing evidence of "actual malice" on the part of defendants in making the alleged defamatory statements.

discretion a district court's decision not to give a tendered jury instruction. Allison v. Bank One-Denver, 289 F.3d 1223, 1241 (10th Cir. 2002). In doing so, we also "consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." Id.; see also Hoffler v. State Personnel Bd., 7 P.3d 989, 990 (Colo. Ct. App. 1999) (indicating that the determination of a privilege, such as the fair report privilege, is a question of law).

The district court concluded that the fair report privilege was inapplicable under the facts presented. More specifically, the district court noted that the "Colorado courts ha[d] consistently adhered to the original Restatement rule which precludes a defamation defendant from invoking the judicial proceedings privilege on the basis of a filed complaint alone." App. at 239; see id. at 4864 (district court refused tendered instruction on the grounds that the judicial proceedings privilege was inapplicable under the facts presented).

We agree with the district court. Restatement (Second) of Torts § 611 states that "[a] report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are . . . reported," and that "publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section." Id., Comment e. The Colorado Supreme Court adopted this rule in 1913, holding in Meeker v. Post Printing & Publ'g Co., 135 P. 457, 458 (Colo. 1913), that the fair report privilege did not apply to the

32

reporting of the contents of pleadings "before any action had taken place on such pleadings." Although defendants assert that Meeker and its progeny do not reflect "the 'modern' and 'majority' rule in the United States," they fail to cite any Colorado cases overruling Meeker. Defs' Op. Br. at 34.

Even assuming, arguendo, that the Colorado courts would now overrule Meeker and conclude that the fair report privilege is applicable to allegations in a complaint, it would provide no relief for defendants. As outlined, it is clear that Rosenthal's statements at the press conference and on the Greg Dobbs Show went well beyond merely reporting the allegations in the Aronsons' complaint. See Restatement (Second) of Torts § 611, comment c (noting that the privilege "extends to any person who makes an oral, written or printed report to pass on the information that is available to the general public"). It is apparent from Rosenthal's statements that he was asserting, as a matter of fact, that the allegations in the Aronsons' complaint were true, and that he, the ADL, and the Aronsons had substantial evidence to support those allegations. Further, on several occasions, Rosenthal's comments went well beyond the allegations of the complaint.

### Federal Wiretap Claims

*Imputation of conduct to the ADL*

At trial, the jury found that the ADL, in violation of the federal wiretap act, 18 U.S.C. §§ 2511(1)(d), 2520(a), "used" the contents of the Quigleys' cordless telephone conversations intercepted after October 25, 1994 (the effective date of the federal

33

statutory prohibition on intercepting and using cordless telephone conversations), to file the verified civil complaint against the Quigleys in December 1994.[8] Defendant ADL attacks the verdict and resulting judgment on the federal wiretap claims (the jury entered separate verdicts on those claims in favor of Mr. and Mrs. Quigley), asserting that it cannot be held responsible for the conduct of attorneys Lozow and Kritzer. More specifically, the ADL asserts that the district court committed two errors in instructing the jury with respect to the ADL's responsibility under the federal wiretap act for the attorneys' conduct, and that the district court erred in concluding there was sufficient evidence to support the jury's verdict on the federal wiretap claims under an agency theory.

Defendant ADL first contends the district court erred in instructing the jury that it could be found liable on plaintiffs' federal wiretap claims for having conspired with attorneys Lozow and Kritzer. See App. at 5041 (instruction on conspiracy theory). According to the ADL, there is no basis in the federal wiretap act for allowing the assertion of a conspiracy claim in a private cause of action brought under the act, nor would it have been proper for the district court to apply the substantive law of Colorado (i.e., that of civil conspiracy) to plaintiffs' claims arising under the federal act.

The initial problem with the ADL's argument is that it was not asserted in district court. In particular, there is no indication in the record, and no assertion by ADL in its

---

[8] Rosenthal was not a defendant on these claims.

34

appellate pleadings, that the ADL ever objected to the district court's instructions

regarding the conspiracy theory.  Thus, the issue has been waived, barring plain error.

See Telecor Communications, Inc. v. Southwestern Bell Tel. Co., 305 F.3d 1124, 1142

(10th Cir. 2002).  "The plain error exception in civil cases has been limited to errors

which seriously affect the fairness, integrity or public reputation of judicial proceedings."

Phillips v. Hillcrest Med. Ctr., 244 F.3d 790, 802 (10th Cir. 2001) (internal quotations

omitted).  Indeed, we have stated that "[i]t is an extraordinary, nearly insurmountable

burden."  Id.

After review, we conclude that the ADL has failed to satisfy this extremely high

burden.  The ADL cannot credibly refute the plaintiffs' assertions that it acquiesced in the

plaintiffs' conspiracy theory and the district court's conspiracy instructions.[9]  Further, the

ADL has failed to cite any case that holds that a person or entity cannot violate the federal

wiretap act by joining with others in a conspiracy.  In contrast, plaintiffs have cited a

handful of cases that at least suggest or imply that it is possible for a person or entity to

violate the federal wiretap act by conspiring with others.  E.g., Bast v. Cohen, Dunn &

---

[9] Although the ADL correctly asserts that the plaintiffs "did not plead a claim for conspiracy to violate the federal wiretap act in their consolidated Complaint, and none was contained in the Final Pretrial Order," Defs' Op. Br. at 35, that assertion misses the point.  Plaintiffs alleged that the ADL violated the federal wiretap act by using the intercepted telephone conversations to prepare the civil complaint filed against the Quigleys.  In support of this claim, the plaintiffs asserted two alternative theories of liability: (1) that Lozow and Kritzer acted as agents of the ADL, and (2) that the ADL conspired with Lozow and Kritzer.

35

Sinclair, P.C., 59 F.3d 492, 495 (4th Cir. 1995); Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994).  Finally, as noted by plaintiffs, defendants urged the district court to utilize a general verdict form on the federal wiretap claims, simply asking the jury to find whether the act was violated under either of plaintiffs' theories of liability (i.e., agency or conspiracy).  See generally Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1468 (10th Cir. 1992) ("A party who fails to bring to the trial court's attention ambiguities created by jury instructions or special verdict forms may not seek to take advantage of such ambiguities on appeal.").  If the jury had been asked to make specific findings with respect to both theories, it would have been easy for this court to determine whether the alleged improper instructions on conspiracy warranted a reversal of the jury's verdict on the federal wiretap claims.

The ADL next contends that the district court erred in rejecting its tendered instruction on agency, which stated:  "To determine whether a person is an agent, the most important factor to consider is whether the principal had the right to control the manner of work performed by the agent."  App. at 532.  The district court rejected the instruction on the grounds that it was "argumentative and unnecessary."  Id. at 4841.  The district court further stated that "[t]he instructions on agency [we]re adequately covered in the definition of agency to which the parties . . . stipulated."  Id. at 4842.

We find no abuse of discretion on the part of the district court in rejecting the ADL's tendered instruction.  Although control is certainly relevant to the existence of an

agency relationship, see Restatement (Second) of Agency § 1 (defining "agency" as a "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control"), the tendered instruction did not state that principle. Instead, the tendered instruction referred to a principle controlling "the manner of work performed" by the agent, a requirement necessary only if an agent is alleged to be an employee as opposed to an independent contractor. E.g. McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 853 (10th Cir. 1996); Restatement (Second) of Agency § 2 (defining "servant" and "independent contractor"). There was no assertion by plaintiffs in this case, however, that Lozow and Kritzer were employees of the ADL.[10] Instead, the sole issue was whether they functioned as agents (i.e., non-servant agents) for the ADL. Thus, the tendered instruction was not consistent with, or relevant to, that particular factual issue.

To the extent the ADL asserts the district court's instructions on agency failed to adequately discuss the issue of control in general, we conclude the assertion has been waived. Prior to trial, the parties submitted several stipulated instructions, one of which set forth a general definition of agency. App. at 561. The district court subsequently incorporated that stipulated instruction on agency into its own set of instructions. Id. at

---

[10] This is consistent with our statements in McCarthy that "attorneys are . . . independent contractors as well as agents," and that, accordingly, they "exercise exclusive control of the manner of performing [their legal work,] being responsible [to the client] only for the result." 80 F.3d at 853 (internal quotations omitted).

37

5031. Although the ADL tendered the above-described instruction concerning a principal's right to control the manner of work performed by an agent, it otherwise made no objection to the district court's instructions on agency. In light of these facts, we conclude the ADL not only failed to raise a specific objection to the district court's instructions on agency, it effectively invited any alleged error in those instructions by joining in offering the stipulated instruction on agency which the district court ultimately adopted. See Aves ex rel. Aves v. Shah, 997 F.2d 762, 766 (10th Cir. 1993) (declining to review instruction for plain error where party objecting to instruction on appeal was the one who offered the instruction at trial).

The ADL contends that plaintiffs failed to present sufficient evidence to demonstrate that Lozow and Kritzer were the agents of the ADL because "[t]here was no evidence that the ADL had the ability to control the conduct of Lozow and Kritzer in those private attorneys' legal representation of the Aronsons." Defs' Op. Br. at 41. We believe the ADL's arguments miss the point. Although the existence of a principal/agent relationship certainly hinged on one or both of the attorneys agreeing to act on the ADL's behalf, i.e., subject generally to the ADL's control, it was unnecessary for the ADL to have the ability to control the particular manner of the attorneys' work, or for the ADL to have the ability to control the attorneys' representation of the Aronsons. Indeed, as noted in the district court's jury instructions, it was possible that the attorneys served as agents for both the ADL and the Aronsons (even though their interests may have been

38

conflicting).

In any event, we conclude there was sufficient evidence of a principal/agent relationship to allow the issue to go to the jury. See generally Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1023 (10th Cir. 2002) (discussing standard of appellate review applicable to district court's ruling on motion for judgment as a matter of law). This evidence was succinctly described by the district court in denying defendants' post-trial motion for judgment as a matter of law:

> As I stated in colloquy with counsel for both sides during defendants' motion for judgment as a matter of law at the close of plaintiffs' case in chief, the question of agency is a close one with facts pointing both ways. Notwithstanding the testimony of Lozow and Kritzer that they were not acting on behalf of the ADL in pursuing the Aronsons' lawsuit against plaintiffs, there is evidence in the record to support a contrary inference. One example is the ADL's payment of Lozow and Kritzer's insurance deductible in their settlement with plaintiffs and the Aronsons. As I noted in the hearing on defendants' motion for judgment as matter of law, the jury could reasonably infer that the ADL's payment was an admission by the ADL that Lozow and Kritzer had an association with the ADL or that the ADL put Lozow or Kritzer in a position where they sustained losses while acting for the ADL.
>     In addition, . . . there is dispute as to whose interests Lozow and Kritzer were really serving. . . . Evidence was introduced at trial which supports a finding that Lozow and Kritzer shared the ADL's concern about anti-Semitism and education of the public about these concerns, so that the jury could reasonabl[y] infer that Lozow and Kritzer were, at various times, motivated by a desire to expose what they perceived to be plaintiffs' anti-Semitism. There is also evidence in the record from which a jury could reasonably infer that Lozow and Kritzer preferred the interests of the ADL over those of the Aronsons insofar as Lozow and Kritzer sided with the ADL in holding the December 7, 1994, press conference against the wishes of Mr. Aronson.

39

App. at 1492-93.[11]

*First Amendment protection*

The ADL contends that even if it violated the federal wiretap act by "using" the intercepted telephone conversations in preparing and filing the civil complaint against the Quigleys, that "use" was protected by the First Amendment. In other words, the ADL contends that the First Amendment would apply to protect it from liability in this case under the federal wiretap act. The district court rejected the ADL's argument during trial. Because the issue raised by the ADL is one of law, our scope of review is de novo. See generally Salve Regina College, 499 U.S. at 231.

In support of its argument, the ADL relies heavily on Bartnicki v. Vopper, 532 U.S. 514 (2001), which was decided after the trial in this case. In Bartnicki, an unidentified person intercepted and recorded a cellular telephone conversation between the president of a local teachers' union and the union's chief negotiator. The conversation concerned the status of negotiations between the union and the local school board, and included references to a potential strike by the union, a discussion of a potential response

---

[11] We note that Rosenthal, in his opening statement and during his appearance on the Greg Dobbs Show, made statements that also lend support to the notion that a principal/agent relationship existed between the ADL and the attorneys. For example, in his opening statement, Rosenthal indicated that the ADL had helped "craft an appropriate strategy." App. at 5179. Likewise, during his appearance on the radio show, Rosenthal stated that the ADL was "facilitating for the Aronsons their legal recourse." Id. at 5197.

to the "board's intransigence," and references to "go[ing] to the[] . . . homes" of the board members, "blow[ing] off their front porches," and "do[ing] some work" on the board members. Id. at 518-19. The recording of the conversation subsequently wound up in the hands of a radio commentator, who played the tape "on his public affairs talk show." Id. at 519. "Another station also broadcast the tape, and local newspapers published its contents." Id. The two people whose conversation was recorded filed suit against various media representatives asserting, in part, that the broadcast of the tape violated the federal wiretap act. The media defendants moved for summary judgment arguing, in part, that their disclosures of the tape were protected by the First Amendment. The district court rejected the defendants' argument, but the Third Circuit reversed, concluding that the federal wiretap act was "invalid because [it] deterred significantly more speech than necessary to protect the privacy interests at stake." Id. at 522. The Supreme Court subsequently granted certiorari to review the matter.

At the beginning of its opinion, the Supreme Court emphasized that the case "present[ed] a conflict between interests of the highest order – on the one hand, the interest in the full and free dissemination of information concerning public issues, and, on the other hand, the interest in individual privacy and, more specifically, in fostering private speech." Id. at 518. Continuing, the Court noted that "the disclosure of the contents" of the intercepted telephone conversation "violated the federal" wiretap act, and that "[t]he only question [wa]s whether the application of the[] statute[] in such

41

circumstances violate[d] the First Amendment." Id. at 525. Although the Court acknowledged the wiretap act served an important purpose by protecting the privacy of communications, id. at 532-33, it emphasized that, under the facts before it, the application of the act "implicate[d] the core purposes of the First Amendment" by "impos[ing] sanctions on the publication of truthful information of public concern." Id. at 533-34. Ultimately, the Court concluded that the privacy concerns at issue had to "give way when balanced against the interest in publishing matters of public importance." Id. at 534. Thus, the Court agreed that the defendants were immune from liability under the federal wiretap act.

Contrary to the ADL's assertions, we conclude the instant case is distinguishable from Bartnicki in a number of respects. First, and most importantly, the contents of the Quigleys' intercepted telephone conversations were not matters of public concern. Although the ADL asserts otherwise, it is apparent after listening to those recorded conversations that the Quigleys were engaging in what they thought was private discussion with each other or with friends and family regarding their ongoing dispute with the Aronsons. Although the Quigleys (primarily Mrs. Quigley) sometimes engaged in derogatory banter about the Aronsons, it is apparent that those comments represented nothing more than private thoughts about an inherently private matter. Further, as previously discussed, there is no credible basis for concluding, as suggested by the defendants, that the Quigleys were engaged in an anti-Semitic campaign to harass the

42

Aronsons and force them out of the neighborhood (indeed, the jury's findings clearly refute the defendants' arguments on this point). Thus, any First Amendment interest in publishing those private remarks was considerably less significant than the First Amendment interest at issue in Bartnicki.[12] Second, unlike the defendants in Bartnicki, the defendants in this case did not accurately portray the contents of the Quigleys' recorded telephone conversations. In Bartnicki, the defendants broadcast the recorded conversation and printed a transcript of the conversation. Here, in contrast, the defendants merely used snippets of the Quigleys' conversations in preparing the Aronsons' civil complaint, and inaccurately portrayed those comments as demonstrating the existence of an anti-Semitic campaign on the part of the Quigleys against the Aronsons. Third, although the jury in this case found that the ADL did nothing to "procure" the recorded conversations, it was uncontroverted that the ADL, from the time of its first contacts with the Aronsons in late October 1994, knew that the Aronsons were the persons responsible for recording the Quigleys' telephone conversations. Further, it was uncontroverted that the ADL knew, during November and early December 1994, that the Aronsons were continuing to record the Aronsons' telephone conversations. This is in contrast to the media defendants in Bartnicki, who "found out about the interception [at issue] only after it occurred, and in fact never learned the identity of the person or persons

_____

[12] The ADL concedes that "[t]he right to petition the government and to engage in public speech through the filing of lawsuits may not enjoy the protection afforded by Bartnicki's holding in a civil case of purely private significance." Defs.' Op. Br. at 49.

43

who made the interception."  532 U.S. at 525.

It is true that the Court in <u>Bartnicki</u> left open the question of whether the interest in protecting the privacy of communications "is strong enough to justify the application of" the federal wiretap act "to disclosures . . . of purely private concern."  <u>Id.</u> at 533. Nonetheless, we are persuaded that, if faced with the issue, the Court would conclude that the interest in privacy is sufficient to allow the federal wiretap act to be applied to situations, such as the case here, involving the "use" of intercepted telephone conversations concerning purely private matters.  Thus, we hold that application of the federal wiretap act to the ADL's actions in this case does not violate the First Amendment.

*Punitive damages*

The federal wiretap act provides that, in a civil action thereunder, "appropriate relief includes" "punitive damages in appropriate cases."  18 U.S.C. § 2520(b)(2).  Only the Eighth and Ninth Circuits have interpreted this provision, both agreeing that to receive punitive damages, a plaintiff proceeding under the federal wiretap act "must show that defendants acted wantonly, recklessly, or maliciously."  <u>Jacobson v. Rose</u>, 592 F.2d 515, 520 (9th Cir. 1978); <u>see</u> <u>Bess v. Bess</u>, 929 F.2d 1332, 1335 (8th Cir. 1991).  This is the standard applied by the district court in the case at hand, and the ADL does not dispute its general applicability.  The ADL contends, however, that the district court erred in

44

submitting the issue of punitive damages on the federal wiretap claims to the jury, and in

denying the ADL's post-trial motion to set aside those punitive damage awards.

The ADL contends it cannot be held liable for punitive damages under the federal

wiretap act because there was no evidence that it authorized, approved, or ratified

Lozow's and Kritzer's use of the intercepted phone conversations and the jury was not

asked to make such a finding. The ADL first raised this issue, in part, in its post-trial

motion to amend or reduce judgment, for a new trial, or for judgment as a matter of law.[13]

App. at 1285-86 (citing Colorado law on the issue of whether a principal can be held

liable for punitive damages for the acts of an agent). The district court rejected the

ADL's argument:

> [E]vidence adduced at trial . . . demonstrated that Towbin and other ADL
> employees were aware of the Aronsons' interception and recording of
> plaintiffs' telephone conversations. The evidence also demonstrated that
> ADL employees attended meetings with the Aronsons, Lozow, and Kritzer
> to discuss the progress of the criminal investigation of plaintiffs as well as
> how to proceed in a civil action against plaintiffs. Furthermore, there is
> evidence that Kritzer advised the ADL that he would contact ADL members
> to discuss strategy before filing the Aronsons' complaint. Based on this
> evidence, a jury could reasonably find that, at a minimum, the ADL

---

[13] Although the ADL attempts to do so now, it did not complain at trial or in its post-trial motion that the issue was not submitted to the jury for consideration. That issue has been waived for purposes of appeal. See Tele-Communications, Inc. v. Commissioner, 104 F.3d 1229, 1233 (10th Cir. 1997). In any event, it is clear from the jury instructions that the jury was asked to determine (a) whether Lozow and Kritzer were agents or co-conspirators of the ADL, and (b) whether the defendants' conduct was wanton and reckless, thereby justifying punitive damages under federal law. Contrary to the ADL's assertions, we conclude there is no plain error arising out of the court's failure to instruct the jury on the issue of authorization, approval, or ratification by the ADL.

approved of Kritzer's use of the intercepted telephone conversations in preparing and filing the Aronsons' complaint. Towbin and Rosenthal's testimony to the contrary simply raised a credibility issue for the jury to resolve. I see no reason to disturb the jury's determination. Consequently, because I am compelled to draw every reasonable inference in plaintiffs' favor, I conclude that there is sufficient evidence in the record to support a finding that the ADL approved of Lozow and Kritzer's use of the intercepted telephone calls in preparing the Aronsons' complaint.

App. at 1499-1500 (internal citation omitted).

We review the district court's denial of defendants' post-trial motion de novo, employing the same standard as the district court. Lantec, 306 F.3d at 1023. "Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Id. (internal quotations omitted).

After reviewing the trial transcript, we conclude the district court properly rejected defendants' motion. It was uncontroverted that ADL employees were in regular contact with the Aronsons from late October until early December 1994, and, during that time period, met with the Aronsons, Lozow, and Kritzer as they formulated a strategy to deal with the Quigleys' alleged anti-Semitic conduct. It was further uncontroverted that ADL employees, including Towbin and others, were well aware that comments made by the Quigleys (primarily Mrs. Quigley) during the recorded telephone conversations provided the primary basis for the conclusion that the Quigleys were engaging in anti-Semitic conduct. Moreover, the ADL, through its employees, was well aware that Lozow and Kritzer were considering filing a civil complaint on the Aronsons' behalf against the

46

Quigleys, and the jury reasonably could have inferred from the evidence that the ADL,

through the actions of Towbin and other employees, promoted that strategy. Lastly, it

was uncontroverted that the ADL (through its national headquarters and general counsel)

ultimately reimbursed Lozow and Kritzer for the amounts they paid in settlement to the

Quigleys and the Aronsons.[14] Based upon this evidence, the jury reasonably could have

inferred that the ADL was ratifying the attorneys' conduct in filing suit against the

Quigleys. See generally Dilley v. SuperValu, Inc., 296 F.3d 958, 966 (10th Cir. 2002)

("Whether sufficient evidence exists to support punitive damages is a question of law

reviewed de novo.") (internal quotations omitted).

The ADL has raised a number of related arguments in its appellate brief, the most

notable of which is that the First Amendment right of association prohibits the imputation

of any liability for the tortious acts of local agents unless the national ADL organization

expressly authorized, approved, or ratified those acts. In other words, the ADL asserts

that its national headquarters never "authorized" or "ratified" the actions of its Denver

branch. Because these arguments were not raised in the district court, however, they are

---

[14] Defendants suggest that this evidence should not be considered in light of NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982). That case is distinguishable, however, because the NAACP in that case "posted bond and provided legal representation for arrested boycott violators," and the evidence indicated that the NAACP "regularly provide[d] such assistance to indigent black persons throughout the country." Id. at 931 n.78. Here, in contrast, there was no evidence that the ADL regularly reimbursed attorneys for expenses incurred in pursuing civil actions on behalf of persons referred to them by the ADL.

waived for purposes of appeal.  See Tele-Communications, Inc. v. Comm'r of Internal

Revenue, 104 F.3d 1229, 1233 (10th Cir. 1997).

The ADL asserts that the good faith belief of Lozow and Kritzer in the lawfulness

of their conduct (i.e., that it was legal for the Aronsons to intercept and record the

telephone calls) prevents the imposition of punitive damages on the federal wiretap

claims.  The ADL asserted this argument in district court in the context of its post-trial

motion for new trial or judgment as a matter of law.  The district court rejected the

argument:

> Although evidence that a defendant believed he was acting lawfully is
> pertinent to a determination of whether he acted with the sufficient state of
> mind to make the award of punitive damages appropriate, I do not find it to
> be dispositive of the issue.  Rather, it is one of several factors for the jury to
> weigh in its consideration of whether to award punitive damages.  Here, the
> ADL focuses exclusively on the fact that Lozow and Kritzer believed that
> the interception of cordless telephone calls was lawful based upon Lozow
> and Kornfeld's research as well as the representations of Pautler and
> Thomas.  What the ADL ignores, however, is evidence concerning the
> "use" of the intercepted telephone calls.  Kritzer was the lead attorney in
> preparing the Aronsons' complaint.  This position enabled him to select
> which intercepted comments to include in the amended complaint and the
> context in which they would appear.  Kritzer also attended two meetings
> with the Aronsons and the ADL in which it was stated that one of the
> objectives of all those in attendance was to publicize what they believed to
> be plaintiffs' anti-Semitic conduct, despite knowing the potential
> implications that such a public disclosure could have on Mr. Quigley's
> career.  The jury could reasonably infer that, in furtherance of this objective,
> Kritzer selected only isolated snippets of the hours of illegally taped
> conversations to frame the Aronsons' complaint in a light favorable to the
> ADL's objective of publically touting the Aronsons' complaint as a "major
> case of anti-Semitism."  Furthermore, nothing compelled Kritzer's use of
> the intercepted telephone conversations in preparing the complaint.  On this
> evidence, the jury could have found by a preponderance of the evidence that

48

Kritzer's action, and by extension the ADL's action, was taken with utter disregard to the serious consequences that would follow allegations of anti-Semitism lodged against plaintiffs.

App. at 1497-98 (internal citation omitted).

Reviewing the issue de novo, we likewise reject the ADL's arguments. The ADL's alleged "good faith belief" in the legality of its conduct was based on the initial legal conclusions reached by Lozow and his associate in late October 1994. More specifically, Lozow and his associate concluded, after researching the matter themselves and after speaking with the district attorney and an assistant district attorney, that it was legal for the Aronsons to intercept and record the Quigleys' telephone conversations. Nothing in the record indicates that Lozow or Kritzer, or their respective associates, investigated the question of whether it was legal for them to disclose or otherwise "use" the contents of those recorded conversations. Indeed, had they researched the matter prior to filing the civil complaint in early December 1994, they may well have (and indeed should have) discovered that such "use" was illegal.[15] Further, as pointed out by the

_____

[15] The dissent suggests the attorneys' research concerning the legality of intercepting and recording the Quigleys' telephone conversations reasonably allowed them to conclude the "use" of tape-recorded telephone conversations was likewise legal. We disagree. In our view, the "use" of tape-recorded telephone conversations is a discrete legal issue under the federal wiretap act. Compare 18 U.S.C. § 2511(1)(a) (concerning the interception of communications) with 18 U.S.C. § 2511(1)(d) (concerning the use of intercepted communications). Further, there is no evidence in the record that the attorneys researched or even considered the legality of using the tape-recorded conversations.

We also reject the dissent's suggestions that (a) it was unnecessary for the attorneys to revisit their research in early December 1994 (prior to filing the civil action), or (b) that

district court, Lozow and Kritzer did not accurately report the contents of the recorded telephone conversations. Instead, they took snippets of those conversations out of context in an attempt to support their claims of anti-Semitic harassment on the part of the Quigleys. Indeed, viewed in the light most favorable to the Quigleys, the evidence suggests that Lozow and Kritzer used the snippets of conversation to falsely portray the Quigleys as anti-Semitic extremists willing to use aggressive and violent tactics to drive the Aronsons from the neighborhood. In light of all these circumstances, we conclude the district court was correct in allowing the punitive damage issue to go to the jury, and that there was a basis for the jury's decision to award such damages. See App. at 5047 (district court's jury instruction stating that, for purposes of determining punitive damages under the federal wiretap act, "[a]n act is wanton and reckless . . . if it is done in such a manner and under such circumstances as to reflect utter disregard for the potential consequences of the act . . . on the safety and rights of others")[16]; Smith v. Wade, 461

had they done so, they reasonably could not have been expected to uncover the October 1994 amendment to the federal wiretap statute. In our view, a reasonably competent attorney researching the issue in December 1994 would have discovered the October 1994 amendment. See generally Texaco, Inc. v. Short, 454 U.S. 516, 531 (1982) ("It is . . . settled that the question whether a statutory grace period provides an adequate opportunity for citizens to become familiar with a new law is a matter on which the Court shows the greatest deference to [legislative] judgment.").

In the end, we believe the attorneys' failure to research the issue, combined with their use of the tape-recorded conversations, constituted "an extreme departure from ordinary care, in a situation where a high degree of danger [wa]s apparent." Keeton, supra at 214.

[16] Although the dissent questions whether the district court's punitive damage instruction was a correct statement of the applicable law, it is undisputed that the ADL

U.S. 30, 33 (affirming similar punitive damage instruction employed in case arising under 42 U.S.C. § 1983); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Torts 213-14 (5th ed. 1984) (defining terms "wanton" and "reckless").

The ADL also contends the district court erred in instructing the jury regarding the alleged good faith belief of Lozow and Kritzer. In particular, the ADL notes that the district court instructed the jury that the ADL's good faith belief was "irrelevant to [its] consideration of [the ADL's] liability upon the claims for violation of the Federal Wiretap Act," and that the ADL was "presumed to know the law, including the requirements of the Federal Wiretap Act." App. at 5043. According to the ADL, it was possible that the jury "could have understood this as a command to disregard the defendants' good faith belief . . . when considering the defendants' liability for punitive damages." Defs' Op. Br. at 52-53.

We reject the ADL's arguments for several reasons. First, it is clear from the record that the ADL did not object to the jury instruction about which it now complains. Although the dissent suggests the ADL was relieved from doing so because the district court stated at the outset of the instruction conference that it would assume the parties were "objecting to everything," we disagree. A complete reading of the transcript of the instruction conference indicates the district court allowed the parties to make specific

has not challenged this instruction on appeal. Nor, for that matter, did the ADL challenge the punitive damage instruction in the district court.

51

objections to the proposed instructions and that, on several occasions, the ADL did object. Thus, this case is distinguishable from Harrison v. United States, 296 F.3d 994, 1002 (10th Cir. 2002) (concluding district court definitively ruled on defendant's objection to admission of evidence where court denied defendant's motion in limine and "made clear to defense counsel that it did not wish to hear repetitive argument on the matter"), the sole case cited by the dissent. Second, even assuming the ADL's objections were properly preserved, we conclude the instruction was consistent with the law and the evidence. The instruction stated the unremarkable proposition that a defendant is presumed to know the law, e.g., Atkins v. Parker, 472 U.S. 115, 130 (1985) ("All citizens are presumptively charged with knowledge of the law."), a presumption the ADL failed, as a matter of law, to rebut. Finally, we note the instruction at issue pertained to the ADL's general liability under the federal wiretap act and not its liability for punitive damages thereunder. Notably, the district court segregated its instructions on general liability under the federal wiretap act from its instructions on punitive damages under the act. See App. at 5041-43 (discussing general liability), 5045-48 (discussing punitive damages). In doing so, the district court instructed the jury that "[t]he standards for the award of [punitive] damages [we]re different, and the burden of proof [wa]s different." App. at 5047. Because juries are presumed to have followed the instructions given to them by the district court, see Smith v. Diffee Ford Lincoln-Mercury, Inc., 298 F.3d 955, 966 (10th Cir. 2002), we fail to see how the instruction to which the ADL now objects impacted the jury's

52

consideration of punitive damages.

The ADL asserts that the punitive damage awards on the federal wiretap claims violate the First Amendment, since they were based "on the content of the defendant's petitioning and speech activities." Defs' Op. Br. at 53. More specifically, the ADL asserts that "[p]unitive damages cannot be imposed for the false content of speech on a matter of public concern unless the factfinder determines both falsity and actual malice under the 'clear and convincing' evidence standard." Id. at 54. It is unclear from the record whether this argument was ever raised in the district court. Assuming that it was, we conclude it has no merit. As previously discussed, there are several reasons why the First Amendment provides no refuge for the ADL in this case, including the fact that the contents of the recorded telephone conversations were purely private matters, rather than matters of public concern, and because the contents of those conversations were not accurately reported by defendants.

Finally, the ADL asserts that the punitive damage award violates due process because the "[s]electivity by an advocate in framing the allegations of court pleading[s] . . . is in no way connected to the purpose of the pertinent provisions of the federal wiretap statute, which is 'to protect effectively the privacy of wire and oral communications.'" Defs' Op. Br. at 54 (quoting Bartnicki, 532 U.S. at 523). Because

this issue was not raised in the district court, it has been waived for purposes of appeal.[17]

### *Invasion of privacy by intrusion*

Defendants contend the district court erred in instructing the jury with respect to plaintiffs' invasion of privacy by intrusion claims. As noted by defendants, the district court instructed the jury that it could find in favor of plaintiffs on those claims if they found the defendants had either intercepted the Quigleys' private telephone conversations on or after October 25, 1994 (the date on which intercepting and taping became illegal under federal law), or had "used" the contents of those conversations. App. at 4872, 5027-28. Defendants contend the "use" portion of the instructions was erroneous because "Colorado[] tort law does not recognize a cause of action for invasion of privacy for mere 'use' of information that was lawfully obtained from others without committing any act of intrusion into a zone of privacy." Defs' Op. Br. at 56. Because defendants failed to raise this argument in the district court, we review only for plain error. See Telecor, 305 F.3d at 1142.

Colorado law recognizes three separate categories of invasion of privacy claims.

---

[17] Even if the issue had not been waived, it has no merit. As outlined above, the punitive damage award was not based solely on the content of the civil complaint, but rather because (a) Lozow and Kritzer failed to determine whether their "use" of the recorded conversations was legal, (b) failed to accurately report the contents of those conversations, and (c) conceivably acted with an intent to harm the reputation of the Quigleys. See Smoot v. United Transp. Union, 246 F.3d 633, 648 (6th Cir. 2001) (affirming district court's award of punitive damages under the federal wiretap act where the defendant attempted to damage plaintiffs' reputations by distributing illegally intercepted communication between the plaintiffs).

54

Denver Publ'g Co. v. Bueno, 54 P.3d 893, 897 (Colo. 2002). These include: (1) unreasonable intrusion upon the seclusion of another ("intrusion"); (2) publicity that unreasonably places another in a false light before the public ("disclosure"); and (3) appropriation of another's name or likeness ("appropriation"). Id. at 896. At issue here is the first category -- intrusion. This tort "focuses on the manner in which information that a person has kept private has been obtained," Doe v. High-Tech Inst., Inc., 972 P.2d 1060, 1065 (Colo. Ct. App. 1998), and thus can encompass conduct such as eavesdropping by wiretapping and persistent and unwanted telephone calls. Id. at 1067. To prevail on a claim of invasion of privacy by intrusion, "a plaintiff must show that another has intentionally intruded, physically or otherwise, upon the plaintiff's seclusion or solitude, and such intrusion would be considered offensive by a reasonable person." Id.

Although it is clear that the interception of the Quigleys' telephone conversations would constitute an intentional intrusion on the Quigleys' seclusion or solitude, the issue raised by defendants is whether, as set forth in the district court's instructions, the "use" of intercepted telephone conversations can also constitute such an intrusion. We conclude the answer to this question is "no." In particular, once the interception of the conversations was complete, any subsequent "use" of the conversations could not have resulted in any additional intrusion on the Quigleys' seclusion or solitude. Certainly, the "use" of such conversations might have resulted in another type of invasion of privacy,

55

i.e., unreasonable publicity given to another's private life.  But no such claim was asserted in this case.  We therefore conclude that the district court committed plain error in instructing the jury on plaintiffs' invasion of privacy by intrusion claims, and that such error warrants a reversal of the judgment on those claims.

We emphasize, however, that the reversal of those judgments does not require a remand, nor does it have any impact on the damage awards that are incorporated into the final judgment.  At the urging of the defendants, and over plaintiffs' objection, the district court utilized a verdict form asking the jury to award compensatory damages in one lump-sum (albeit divided into economic and non-economic damages) for all of the claims (both state and federal) upon which they found in plaintiffs' favor.  App. at 4883-86 (discussion of verdict form at instruction conference).  In doing so, the district court concluded, without objection from the defendants, that the damages for each of the state law and federal claims were "the same."  Id. at 4884.  The jury, in turn, found the ADL liable on five separate claims (i.e., four state law tort claims and one federal claim), but awarded only one lump-sum compensatory damage award to each of the plaintiffs.  Thus, our reversal of the judgment on the invasion of privacy by intrusion claims has no effect on the damage awards, since those awards are supported by the verdicts on the remaining claims.

### *Vacatur of damage awards on First Amendment grounds*

Defendants contend that the compensatory and punitive damage awards must be

56

vacated "[s]ince one or more of the Quigleys' claims upon which the jury found liability was improperly submitted to the jury, [having] involved conduct that was, as a matter of law, protected by the First Amendment." Defs' Op. Br. at 58.

We reject this contention for three reasons. First, defendants fail to point to where in the record they raised the issue in the district court. Second, for the reasons outlined above, we conclude the district court's submission of the plaintiffs' claims to the jury did not violate the First Amendment. Finally, as outlined above, the defendants themselves urged the district court, over the objection of the plaintiffs, to utilize a verdict form asking the jury to assess lump-sum compensatory damage awards for the state and federal claims (the jury was asked, however, to assess separate punitive damage awards for the state and federal claims). Further, in doing so, defendants conceded that the compensatory damages on all of the claims were the same. Thus, they are in no position to establish reversible error arising out of the fact that the compensatory damage awards are not divided separately between the claims.

### *False light invasion of privacy*

Prior to trial in this case, the Colorado Court of Appeals held that Colorado law would recognize "false light" claims. See Bueno v. Denver Publ'g Co., 32 P.3d 491 (Colo. Ct. App. 2000). Shortly before we heard oral argument in this appeal, however, the Colorado Supreme Court reversed that decision and "join[ed] those jurisdictions that do not recognize false light as a viable invasion of privacy tort." Denver Publ'g, 54 P.3d

at 894. In light of the Colorado Supreme Court's decision, we must set aside the judgment of the district court on plaintiffs' "false light" claims. For the reasons outlined above in our discussion of the invasion of privacy by intrusion claims, our action in this regard does not require a remand nor does it have any effect on the damage awards that are part of the judgment.

## CONCLUSION

We REVERSE the judgment of the district court with regard to plaintiffs' invasion of privacy by intrusion and false light invasion of privacy claims. Our reversal of these judgments does not have any effect upon the damage awards. We AFFIRM the judgment of the district court in all other respects.

**No. 01-1228, QUIGLEY v. ROSENTHAL**

**HARTZ,** Circuit Judge, concurring in part and dissenting in part:

I join in much of the majority opinion: (1) reversal of the judgment on plaintiffs' claims for invasion of privacy by intrusion and false light invasion of privacy; (2) rejection of defendants' invocation of the fair-report privilege; (3) affirmance of the judgment for compensatory damages under the federal wiretap act based on plaintiffs' unchallenged conspiracy theory (making it unnecessary, in my view, to determine whether defendants adequately preserved a claim that the agency instructions failed to inform the jury properly regarding the element of control); and (4) rejection of defendants' First Amendment argument predicated on *Bartnicki v. Vopper*, 532 U.S. 514 (2001).

I respectfully dissent, however, on two issues. First, I believe that defendants' allegations regarding plaintiffs touched on a matter of public concern. Therefore, the jury could award damages for defamation only if it found that defendants had acted with malice. Because the jury was not instructed that it had to find malice, the defamation verdict must be reversed. Reversal of the defamation verdict would leave no state-law cause of action, so state-law punitive damages would also need to be set aside. The defamation claim could, however, be retried.

Second, I would reverse the punitive-damages award against the ADL on the federal wiretap claim. Although the ADL has not preserved its most compelling grounds for reversal of the award (the insufficiency of the evidence to support punitive damages

and the improper instruction regarding what the jury must find before imposing such damages), it is still entitled to relief because of an improper instruction stating that it was presumed to know the law contained in the federal wiretap act.

I.    **Defamation**

My ground for departure from the other members of the panel on the defamation claim is that I believe defendants' allegations against plaintiffs touched on a matter of public concern. I do, however, agree with the majority opinion on our starting point for the public-concern analysis: "Unfortunately, Colorado law provides no clear set of guidelines for determining whether a matter is of 'public concern.'" Maj. Op. at 26. The Colorado courts have issued only a few decisions on the subject, and none involved facts closely analogous to those presented in this case. Reasonable people can therefore differ on how to apply Colorado law here. I do not believe that the majority opinion unreasonably construes Colorado law. Nevertheless, I think it is in error.

To begin with, it is essential to keep in mind that in determining whether allegedly defamatory statements are matters of public concern, a court must assume the statements to be true. If only true statements could be matters of public concern, Colorado's public-concern doctrine would be an empty gesture, because true statements can *never* be the basis for a defamation cause of action. *See Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1341 (Colo. 1988); Restatement (Second) of Torts § 558 (1977).

Assuming, then, the truth of defendants' allegations, the question before us is

whether it is a matter of public concern that residents of an upscale neighborhood have conspired to engage in violence and intimidation to remove a family from the neighborhood because of the family's religious heritage. I acknowledge that the allegations do not concern the exercise of governmental power. Nor would the alleged conspiracy affect many people directly. Indeed, the allegations would be unlikely even to engender personal fear in most people; after all, Jews constitute a small minority of the population.

Nevertheless, as noted by the majority opinion, "[t]he determination of whether . . . speech touches a matter of public concern rests on a particularized examination of each statement to determine whether it can be fairly considered as relating to any matter of political, *social*, or other concern to the community." Maj. Op. at 26-27 (quoting *Barrett v. Univ. of Colo. Health Sci. Ctr.*, 851 P.2d 258, 263 (Colo. Ct. App. 1993)) (emphasis added). Thus, a purely social concern can be a matter of public concern. I would have thought that *the* social concern of our day is bigotry. Surely, faith-based intolerance, particularly when combined with threats of violence, is a matter of concern to the community at large. Our recognition of Martin Luther King's birthday as a national holiday is intended to underscore this country's commitment to end bigotry, private as well as official. Accounts of private acts of bigotry, from the schools to the office to baseball fields, can regularly be found in the media. After the tragedy of September 11, incidents of private violence against Muslims garnered front page headlines and prompted

a speech by the President. In this case itself, the *Denver Post* and *Rocky Mountain News* each published a story about the complaint filed against plaintiffs *before* defendants conducted a press conference.

Interestingly, plaintiffs apparently accept the characterization of faith-based bigotry as a matter of public concern. In their Answer Brief they write:

> Surely, ADL contends, a plaintiff's conspiratorial plan to harm persons of a particular religious faith and drive them from the neighborhood, all as furthered by the performance of criminal acts, is a matter of public concern.
>
> The Quigleys do not disagree with that proposition in the abstract. The problem for ADL's position is that none of this was true.

Ans. Br. at 30. Because I disagree with the suggestion that application of Colorado's public-concern doctrine depends on the truthfulness of the allegedly defamatory statements, I think plaintiffs have conceded the real issue before the court.

In any event, regardless of whether plaintiffs have conceded the issue, I believe that Colorado law required plaintiffs to prove that defendants' defamatory statements were uttered with malice—that is, with knowledge or reckless disregard of the statements' falsity. Because the jury was not so instructed, judgment on the defamation claim, for both compensatory and punitive damages, must be set aside and the matter remanded for further proceedings.

II.     **Punitive Damages**[1]

The federal wiretap act authorizes awards of punitive damages. It does not, however, describe the circumstances in which such awards are permissible. Nevertheless, the standard for granting an award is reasonably clear.

In *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), the Supreme Court interpreted the Civil Rights Act of 1991, which authorized punitive damages for intentional violations of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990, when committed "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Court held that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Punitive damages were therefore available under the statute only if the violator "*knew or showed reckless disregard for the matter of whether its*

_____

[1] I should mention a peculiarity of the jury's punitive-damage awards. The federal-law punitive award was much higher than the state-law punitive award. My first reaction to this discrepancy was that the jury must have been particularly offended by the act that violated federal law—the interception of plaintiffs' telephone calls. But there is a more likely explanation. Under Colorado law an award of punitive damages cannot exceed the award of compensatory damages. Colo. Rev. Stat. Ann. § 13-21-102. The sum of the jury's state-law punitive awards (against both defendants, in favor of both plaintiffs) equals the sum of the compensatory awards (although the jury gave Mrs. Quigley a punitive award that exceeded her compensatory award while giving Mr. Quigley a punitive award less than his compensatory award). It seems reasonable to conclude that the jury would have awarded the same amount of punitive damages on the state-law claim as on the federal-law claim if state law had allowed a higher award.

*conduct was prohibited by the statute*." *Id.* at 537 (internal quotation marks omitted; emphasis added).

The federal wiretap act does not include language identical to, or even comparable to, the language of the Civil Rights Act of 1991 setting forth the conditions for imposing punitive damages. All it says is that relief under the act may include "punitive damages in appropriate cases." 18 U.S.C. § 2520(b)(2). Still, the gist of the Civil Rights Act language is implicitly incorporated. First, the "with malice or with reckless indifference" language is a typical formulation of the scienter requirement for punitive damages. There are a number of other formulations, but their meanings are essentially the same. *See Smith v. Wade*, 461 U.S. 30, 46-48 (1983). Second, the requirement that the wrongful scienter be directed at "the federally protected rights of an aggrieved individual" is a natural consequence of the remedy's being afforded under a federal statute. The purpose of authorizing punitive damages under the federal wiretap act is to protect the rights created by that act. It would be rather remarkable if Congress intended the punitive-damages provision of the act to authorize punitive damages for, say, malicious violation of some state-law right not otherwise protected by the act.

Thus, it is safe to say that punitive damages under the federal wiretap act are to be awarded only for violations of the act committed "with malice or reckless indifference to the federally protected rights of an aggrieved individual." As support for this proposition, I note that several of our sister circuits have interpreted the Fair Housing Act, 42 U.S.C. §

-6-

3613(c)(1), which, like the federal wiretap act, authorizes punitive damages without describing when they can be awarded, as requiring that the defendants "acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Badami v. Flood*, 214 F.3d 994, 998 (8th Cir. 2000); *accord Preferred Properties v. Indian River Estates*, 276 F.3d 790, 799-800 (6th Cir. 2002); *see Alexander v. Riga*, 208 F.3d 419, 430-32 (3d. Cir. 2000); *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 266 (7th Cir. 1996).

Accordingly, to award punitive damages against the ADL in this case, the jury would have to find that the ADL "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [federal wiretap act]." *Kolstad*, 527 U.S. at 537.

I do not see how the jury, if properly instructed, could have made such a finding. As the majority opinion sets forth, the attorneys upon whom the ADL was relying researched the law in late October 1994 and determined (correctly) that interception of plaintiffs' conversations did not violate the federal wiretap act. These attorneys even contacted two state prosecutors who confirmed this conclusion. The problem here is that the law had changed (because of an immediately effective statutory amendment) by early December, less than six weeks later, when the complaint was filed and the press conference conducted.

The majority opinion seems to suggest that the ADL should have rechecked the

law in early December.  Perhaps it is good practice to recheck the law periodically (although clients may be unwilling to pay for its being done too often).  Yet I doubt that it would even be negligence, much less reckless indifference, not to recheck the law every few weeks.  Here, the statutory amendment would not have been readily available in a printed codification by the time of the press conference.  If lawyers are supposed to discover and apply the law within a few weeks of the law's enactment, then why don't new rules of procedure take effect immediately upon adoption, instead of giving the bar a few months to absorb the change?  Quite recently this court was called upon to decide how thoroughly a criminal defense attorney should research a statute.  The client had been prosecuted with evidence obtained through a wiretap purportedly authorized by Wyoming law.  Our opinion held that the attorney had not provided ineffective assistance of counsel by failing to discover that the Wyoming wiretap statute had expired under a sunset provision more than three years before the surveillance in question.  The court wrote, "[W]e doubt that prevailing professional norms require a review of all session laws implicated in a prosecution."  *United States v. Salazar*, No. 02-8048, slip op. at 9, __ F.3d __, __ (10th Cir. Mar. 26, 2003).  I question whether it would have been significantly more difficult for the Wyoming defense attorney (whose client's liberty was at stake) to find the Wyoming session law than for the ADL's attorneys to find the just-enacted amendment to the federal wiretap act.

    The majority opinion also suggests that the ADL could be found to have the

scienter requisite for punitive damages because there is no evidence that its attorneys "researched or even considered" the legality of using the recorded conversations. Maj. Op. at 49 n.15. But if, as the attorneys found to be true before the October 25 amendment, the wiretap statute did not cover interceptions of cordless-phone conversations, it was a natural—indeed a compelling—inference that the statute also did not prohibit the *use* of such interceptions. (In fact, the only "use" of unlawfully intercepted communications that is barred by the wiretap act is use by one who knows or has reason to know that the interceptions violated the act. 18 U.S.C. § 2511(1)(d).)

In any event, even if there was negligence here in not discovering the new law, I do not see how the ADL's violation of the wiretap act could be characterized as knowing or recklessly indifferent. *Cf. Trans World Airlines v. Thurston*, 469 U.S. 111, 128-30 (1985) (airline attorneys' overlooking statutory violation in its transfer policy was not conduct in reckless disregard of the statute). The ADL may have done many other things wrong, such as not checking the accuracy of its allegations. But those misdeeds are irrelevant to the availability of punitive damages under the federal wiretap act unless the ADL knew or acted in reckless disregard of whether the act was being violated.

Having said all this, I nonetheless would not set aside the award of punitive damages on the ground of insufficient evidence. By failing to move at the close of evidence for judgment as a matter of law on the claim for punitive damages, the ADL did not properly preserve the issue below. Even if a defendant moves for a directed verdict at

the close of the plaintiff's case, the defendant must renew the motion at the close of all evidence (but before the jury returns a verdict) to preserve the issue for appeal. *See Dilley v. SuperValu, Inc.*, 296 F.3d 958, 962 (10th Cir. 2002). (And I should add that I doubt that the ADL's post-verdict motion for judgment adequately raised the specific evidentiary failure that I have been addressing.)

This is not a mere technical requirement. If such a motion has merit, and the trial judge decides to grant it, the plaintiff, having had its attention directed to the gap in its evidence, may request the opportunity to reopen the evidence to fill the gap. That opportunity is lost if the motion is raised only after the verdict is rendered. For this reason, I would be extraordinarily reluctant to review the sufficiency of the evidence under a plain-error standard. We cannot know on appeal what evidence the plaintiff might have offered at trial if it had been shown the necessity of doing so. Although this circuit on occasion has conducted plain-error review of the sufficiency of the evidence in civil cases, *see, e.g., Dilley*, 296 F.3d at 962-63; *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1220 (10th Cir. 1998), I am not aware of such review ever having resulted in a reversal.

Of course, regardless of whether we can reverse the judgment on the ground of insufficiency of the evidence, the judgment may be challenged on the ground that the jury was not properly instructed. Indeed, I suspect that the jury awarded punitive damages under the federal wiretap act only because of erroneous instructions.

The jury was not instructed that it had to find that the ADL acted with knowledge or reckless disregard of whether it was violating the federal wiretap act. The punitive-damages instruction required the jury to find that the ADL's conduct was "wanton and reckless," "reflect[ed] utter disregard for the potential consequences . . . on the safety and rights of others," and was "especially shocking and offensive." Such conduct would be egregious, but not necessarily founded on a knowing or reckless disregard of the federal wiretap act.

As noted by the majority opinion, the ADL did not object to the punitive-damages instruction. Nevertheless, in this instance the ADL's failure to object is not fatal. Early in the conference regarding jury instructions, the following exchange occurred:

| | |
|---|---|
| **Counsel for plaintiffs:** | Just a procedural question. Would you prefer that we hold our objections to the Court's instructions until after the Court has gone through— |
| **Court**: | No. I'm going to assume you guys object to everything in the world, and I'll state that for the record. I'm assuming you're objecting to everything that I do. |

Aplt. App. at 4841. Given this comment by the judge, the ADL did not need to object to an instruction in order to preserve the matter for appeal. *See United States v. Harrison*, 296 F.3d 994, 1002 (10th Cir. 2002) (defendant did not need to object in order to preserve issue, because court had indicated that it did not wish to hear further argument on the

-11-

matter).  The ADL cannot be accused of sandbagging here.  Not only did it not indicate

approval of the punitive-damages instruction, but it also had gone so far as to proffer an

instruction that good faith was a complete defense to all federal-wiretap-act claims.

Remarkably, however, on appeal the ADL has not challenged the punitive-

damages instruction.  Therefore, I would not reverse on this ground.

Of the two challenges to the instructions that the ADL actually made on appeal,

one can be swiftly dealt with.  The ADL complains of the district court's rejection of its

proffered good-faith-defense instruction.  But the proffered instruction was addressed to

compensatory as well as punitive damages, misstated the law, and was properly rejected.

The other challenge is to the following instruction given by the court:

> [W]hether the defendant, the Anti-Defamation League, knew that the interception of the Quigleys' private telephone conversations or the use of those conversations was illegal is irrelevant to your consideration of liability upon the claims for violation of the Federal Wiretap Act. *Defendant is presumed to know the law, including the requirements of the Federal Wiretap Act.*

Aplt. App. at 5043 (emphasis added).[2]  Given this quoted instruction, the ADL's violation

of the federal wiretap act was presumed to be knowing.  Contrary to the implication of the

---

[2]The district court next said, "I will now turn to the subject of damages," and discussed in turn the three types of damages (nominal, compensatory, and punitive) at issue with respect to plaintiffs' various causes of action. *Id.*  At the outset of the discussion of punitive damages, the court said that the matter "is complicated, because the standards are different depending on what claim you are considering." *Id.* at 5045. Among the differences between state and federal punitive damage standards are the Colorado cap on such damages (*see, supra*, n.1) and the Colorado requirement of proof beyond a reasonable doubt.

-12-

majority opinion, the trial court did not tell the jury that the presumption of knowledge was rebuttable. Instead, the first quoted sentence tells the jury to disregard any evidence concerning actual knowledge of the law. No further instruction told the jury to ignore the quoted instruction when considering punitive damages. If we presume that juries follow the court's instructions, the jury must have obeyed the quoted instruction.

Of course, the ADL did not object at trial to this instruction. But, as previously discussed with respect to the punitive-damages instruction, this failure is not fatal, given the district court's statement that it would assume that counsel were objecting to all instructions.

The only question left, then, is whether the erroneous instruction requires reversal. I am far from certain that the instruction influenced the verdict. My review of the record suggests that the jury's sense of outrage was based on the rush to publicize unsubstantiated accusations of despicable conduct, not the violation of the wiretap act. Nevertheless, I do not think that this error can be held to be harmless. The instruction could well have influenced the jury's decision whether to award punitive damages, as well as the amount of the award. Accordingly, I would reverse the award of punitive damages on this ground.